## Case No. 8,091.

### LARKIN v. UNITED STATES.

[Hoff. Land Cas. 313.] [1]

District Court, N. D. California. Dec. Term, 1857.

MEXICAN LAND GRANTS—MISSION PROPERTY—GENUINENESS OF GRANT.

1. The bona fides of the grant produced is not sufficiently established by the evidence.

2. But if the grant be genuine, the claim must be rejected. on the ground that the governor had no power to grant in colonization. or sell for a money consideration, the orchards and like property of the missions.

[3. A Mexican land grant will not be allowed in the absence of all proof from the archives, of all evidence of possession under the Mexican government, of the payment of the consideration, and of all explanation from the Mexican governor as to the circumstances under which he made the grant.]

Claim for about fifteen acres of land [part of the orchard of Santa Clara] in Santa Clara county, rejected by the board, and appealed by the claimant [Thomas O. Larkin].

Thornton & Williams, for appellant.
P. Della Torre, U. S. Atty.

HOFFMAN, District Judge. The claim in this case is founded on the alleged grant to Castañeda, Arenas and Dias, the merits of which were considered in the case of Redman v. U. S. [Case No. 11,631]. The testimony in the two cases is nearly identical, exept that in this the depositions of John Forster and José Matias Moreno have been taken. John Forster swears to the genuineness of Pio Pico's and Moreno's signatures. I do not understand it to be disputed that the documents were actually signed by them. The allegation on the part

[1] [Reported by Numa Hubert, Esq., and here reprinted by permission.]

of the United States is, that the signatures were affixed after the conquest of the country. Forster testifies in addition that the grant is in the handwriting of Francisco Lopez, now deceased. The deposition of this witness was the first taken in the cause. He was not probably aware that the document would be proved to be in the handwriting of Castañeda—a fact admitted by Moreno himself, whose testimony was taken since the claim was rejected by the board. Moreno testifies that the signatures of himself and Pico are genuine, and affixed at the times the documents bear date, and that Pico signed them in his presence. He also swears that the documents are in the handwriting of Castañeda; that he saw him write them; that they were written under his (witness') directions, as he was much occupied with official duties. It is enough to say with respect to this statement, that it is abundantly proved by the testimony of General Castro, Benito Dias, Luis Arenas and Cayetano Arenas, that Castañeda could not have been at Santa Barbara on either the thirtieth of June or the second of July, the days on which the documents are dated. The testimony of Cayetano Arenas, the chief witness for the claimants, is wholly incompatible with the idea that Castañeda could have been at Santa Barbara and written the grant by Moreno's directions. Arenas states that the governor sent the grant to him, "with instructions to retain it until Castañeda came from the upper country." It cannot surely be pretended that at that time Castañeda was with the governor, writing out the grant and receipt, and delivering the articles mentioned in the latter.

In the opinion delivered in the case of Redman v. U. S. [supra], the omission to take the depositions and to obtain explanations from Pico and Moreno was adverted to. The testimony of Moreno taken in this case has confirmed me in the views expressed in that opinion, as to the character of this claim. On the hearing of the cause it was objected on the part of the claimants, that the depositions of Benito Dias and others, which are contained in the transcript of the proceedings of the commissioners, were not properly in evidence before this court. Those depositions were admitted under a stipulation which provided that "the depositions of Benito Dias, etc., taken in case number seven hundred and forty-two, on the docket of this commission, be read and used in evidence in and upon the hearing of this cause before this commission only," etc. It was urged that this stipulation authorized by its terms the admission in evidence of the depositions before the board only, and that if the testimony was desired to be used by the United States in this court, it must be regularly taken. The district attorney thereupon proposed that the witness should be called by the court, with liberty to either side to cross-examine. This proposition was declined. He then contended that by the act of 1851, the court was required to render judgment on the pleadings and evidence taken before the board, and contained in the transcript, as well as the further evidence taken by order of this court, and that depositions could not be admitted and used in evidence before the board without becoming a part of the evidence in the case to be considered by this court, and that all stipulations which allowed the evidence to be used before the board, but withheld it from this court, were controlled and avoided by the positive provisions of the statute.

I should have much preferred to have had the witnesses reëxamined, with full opportunity to the counsel for the claimant to cross-examine. The United States, however, insist that the evidence is already in the case, and call upon the court to pass upon the question. I am not without doubt on the point, but I incline to the opinion that whatever evidence is legally admitted and used as such before the board, becomes, by force of the statute, evidence in this court on appeal, notwithstanding that a stipulation of counsel may have provided that it should be used and read before the board only. If this evidence be received, I think it clear, as before stated, that under the proofs, the case must be rejected. I have stated the point made by the counsel for claimants, that it may be availed of in the supreme court on appeal. But even without these depositions, it is by no means clear that the claim should be confirmed on its merits. There would still remain proof that the grant was signed at Santa Barbara, and that it is in the handwriting of Castañeda. The statement of Cayetano Arenas, that it was sent to him on the fourth of July, to be retained until Castañeda arrived from the upper country, of itself justifies the inference that Castañeda could not have been, at the time the grant was drawn, with the governor; and the hypothesis that he might have drawn it and sent it to the governor, is not only inconsistent with Moreno's evidence, but irreconcilable with the fact that the date of the instrument is in the same handwriting and evidently written at the same time with the body of the instrument. But even if this hypothesis be admitted, it destroys the presumption which would have arisen from the date, that the instrument was executed on that day. The burden would then be on the claimants to establish the date. This they have attempted to do by the evidence of Moreno and Cayetano Arenas. But their testimony is, as we have seen, contradictory—the one swearing that Castañeda drew out the grant by his direction, because he was much occupied—the other, that it was sent to him to be delivered to Castañeda when he arrived from the upper country. The only evidence of the payment

of the alleged consideration is the receipt of Pio Pico, also in the handwriting of Castañeda, and purporting to be written on the second of July, the very day on which, if Cayetano Arenas is to be believed, the governor must have forwarded the original grant to him to be delivered to Castañeda.

In the absence of all proof from the archives, of all evidence of a possession under the former government, and of all explanation from the governor as to the circumstances under which he made the grant or the payment of the consideration, I think it would be the duty of the court, even if the depositions referred to be excluded, to reject the claim. But it is objected on the part of the United States that, assuming the grant to have been executed on the day it is dated, and for the consideration mentioned in it or shown by the receipt, it is void for want of power in the governor to make it. The general right of the governor of California to grant vacant lands formerly pertaining to the missions, is not disputed. It is urged, however, that the exercise of this right was, at the time of making this grant, expressly prohibited by the supreme government. This prohibition is supposed to be contained in the following official note:

"Ministry of Justice and Public Instruction. Most Excellent Sir: His excellency the president has received information that the government of the department has ordered to be put up at public sale all the property pertaining to the missions, which your predecessor had ordered to be returned to the respective missionaries for the direction and administration of their temporalities. Therefore, he has thought proper to direct me to say that the said government will report upon these particulars, suspending thereupon all proceedings respecting the alienation of the before mentioned property until the determination of the supreme government. I have the honor to communicate it to your excellency for the purposes indicated, protesting to you my consideration and esteem.

"God and Liberty.

"Mexico, Nov. 14th, 1845.

"Montesdioca.

"To his Excellency the Governor of the Department of the Californias."

The effect of this instrument upon the power of the governor is the question to be examined. The official note above quoted unquestionably enjoins a suspension of all further proceedings as to the property referred to. But what property does it refer to? The document itself states: "The property which your predecessor had ordered to be returned to the respective missionaries for the direction and administration of their temporalities." The predecessor referred to was Micheltorena. The inquiry then is, what property had Micheltorena ordered to be returned to the missions? The order of

Micheltorena is contained in his proclamation, dated March 29th, 1843. But to understand clearly the object and effect of that proclamation, the then existing condition of the missions, and the previous acts of the government with regard to them, must be noticed.

The decree by which the missions of California were secularized was passed, as is well known, in 1833. Its general object was to convert the missions into parishes under charge of secular priests or curates, and to form villages and distribute the lands to colonists. Of the houses belonging to the missions, one was to be selected as the residence of the curate, and land was to be appropriated to him not exceeding two hundred varas square—the rest were to be used for town houses, primary schools and public establishments and offices. Various decrees were made and instructions given during the years 1833 and 1834, having for their object to secure the colonization, and render effective the secularization of the missions, as provided by the first decree. By the instructions given to Don José M. Hijar, political chief of Upper California, provision was made for the distribution of the movable property of the missions, and on the ninth of August, 1834, Figueroa, then governor of California, made provisional regulations on the same subject, "that the fulfillment of the law might be perfect." By these regulations the commissioners, who by a previous regulation had been authorised to take charge of all the "lands, movable securities and property of all classes," were required to make out inventories of the property of the missions, "such as houses, churches, workshops and other local things—stating what belongs to each shop, that is to say, utensils, furniture and implements; as also of the vines and vegetables, with an enumeration of the shrubs; also an estimate of the number of cattle," etc. The inventories were to be kept from the knowledge of the priests, and to be under charge of the commissioners. It is apparent from the whole tenor of the provisional regulations, that the government intended to take possession of all the property, real and personal, belonging to the missions; that the curates who were to be appointed were to be supported by the salaries allowed by the government, and that, until their appointment, the missionaries were to be relieved from the administration of temporalities, and to confine themselves to their spiritual functions.

The provisional regulations made by Figueroa seem to have given rise to great abuses, for in January, 1839, we find Governor Alvarado, in view "of the mournful condition in which affairs now are," making a provisional law defining and restricting the powers of the administrators of the missions, and providing for the protection of the natives, and the preservation and proper application of

the property. Such seems to have been the condition of the missions at the date of Micheltorena's proclamation.

The first article of that proclamation declares that the government will order the missions of San Diego, San José, etc., to be delivered up to the Rev. padres whom the respective prelate may appoint, and said missions shall continue to be administered by them as tutors to the Indians, in the same manner as they held them formerly. It is perhaps not very clear whether by this proclamation the governor intended to restore to the fathers all the lands remaining ungranted at the time, or only the houses, orchards, gardens, etc., which owed their existence to the labors of the missionaries. The second article of the proclamation would seem to favor the first view, for it declares, "that as policy makes irrevocable what had already been done, the missions will not claim any lands already granted, up to this date," etc., seeming to imply that they were authorised to claim the restoration of all the ungranted land. On the other hand, it is evident that the proclamation was made in pursuance of the president's decree of November 17th, 1840. This decree was issued on the petition of the bishop of the Californias. In that petition the bishop adverts to the destitute condition of the priests, and the disorders which had arisen in the missions, and insists that "the houses and orchards which the missionaries had made, which are contiguous to and in immediate communication with the churches, remain to the use and benefit of the missionaries."

It may, therefore, very possibly be, that the restoration ordered by Micheltorena was only that of the houses, orchards, gardens, etc., solicited by the bishop, and was not intended to repossess the fathers of the extensive tracts of uncultivated lands formerly pertaining to the establishments. The last clause of the proclamation clearly shows that the government intended to retain the right of granting such lands, for the governor promises not to make any new grants "without the information of the reverend padres, notorious unoccupancy, want of cultivation, or necessity." It is possible, however, that the intention of Governor Micheltorena was not merely to restore the houses, orchards, etc., to the fathers, but by placing all the lands of the missions under their administration, and subjecting the Indians to tutelage, to collect and protect that dispersed and oppressed people. Be this as it may, the design seems to have been very soon abandoned, and we find Micheltorena granting mission lands as freely as any of his predecessors. On the twenty-fourth of August, 1844, the departmental assembly passed an act providing for the sale of mission property to defray the expense of the war with the United States, supposed to be impending. The war did not however occur, and

on the twenty-first of April, 1845, the assembly made a decree suspending the sale of the missions, and reserving and appropriating the adjoining lands as common lands. On the twenty-eighth of May, 1845, a decree was made by the assembly, directing the sale of certain of the missions, which were regarded as villages, and the leasing of others. "To expedite the enforcement of this decree," Governor Pio Pico, on the twenty-eighth of October, 1845, issued regulations for the renting and alienation of the missions, the first of which provided that certain of them should be sold to the highest bidder. On the thirtieth of March, 1846, the assembly made a decree authorising the government to carry into effect the decree of the twenty-eighth of May last, and providing that if necessary to avoid their total ruin, and in case it was impracticable to lease them, they might be sold at public auction to the highest bidder. The assembly does not at this time seem to have been aware of the order signed "Montesdioca," which issued in November preceding, for we find from their records that on the fifteenth of April that order was officially communicated to them by the governor. No subsequent decree with reference to the mission property was made until after the conquest of the country. It is not easy to perceive from what source the assembly derived the power they thus attempted to exercise. By the Mexican constitution of 1843, the powers of the assemblies under the colonization laws were preserved, and those laws were required to be observed. But by the colonization laws, their powers were confined to approving or disapproving the concessions made by the governor; nor have I been able to discover whence they derived the authority to increase the powers of that officer, or to authorize sales or grants by him, which, under the colonization laws in force, he had otherwise no authority to make. Such seems to have been subsequently their own view, for on the thirty-first of October, 1846, an act was passed declaring void the sales of the missions made by Pio Pico, as governor, as well as all other acts done by him without authority. As an act of the assembly, this proceeding may have no force, for it was passed after the final conquest of the country; but it serves to express the opinion of that body as to the validity of the acts of the governor with respect to the missions, and probably as to the extent of their own authority to enlarge his powers under the colonization and other laws of the nation, and the regulations and orders of the supreme executive.

The order signed "Montesdioca" is dated, as we have seen, on the fourteenth of November, 1845. The decree of the assembly which Pio Pico endeavored to carry into effect by his proclamation of October 28th, 1845, was passed May 28th, 1845. It is probable, there-

fore, that this decree occasioned the order of November 14th, from the supreme government, by which all further proceedings were suspended, and it would seem that the supreme government interposed at the earliest moment to prevent the governor and assembly from carrying out the designs which their decree and the governor's proclamation indicated. The words of the order in the original are "los bienes pertenentes á las misiones." The term "bienes" appears to be of comprehensive import, and includes all things, not being persons, which may serve for the uses of man. It may perhaps be rendered by the word "property," and would thus seem to refer to those cultivated lands, orchards, etc., and other appurtenances, such as houses, work shops, utensils, etc., which, as we have seen, had been taken possession of by the administradores, and which, on the petition of the bishop, had been recognized by the president in his decree of November 17th, 1840, as belonging to the missionaries. It is to be observed moreover, that the president, in the order last referred to, declares that he decrees in conformity with everything which the reverend bishop of the Californias has requested, and "also in conformity with the law of November 7th, 1835, which directs the missions to be restored to their former condition, for which purposes orders shall be issued to the governor of the Californias for the restoration to the fathers of the possessions and property used by them under their administration for the conversion of the heathen," etc. The terms of this order indicate that the governor referred to the property used by the missionaries in their pious labors, and not to the extensive tracts of vacant land which might formerly have been included within the limits of the establishments. That the law of 1835 did not suspend the power of the governor to grant the mission lands, has been decided by the supreme court, in the case of U. S. v. Ritchie, 17 How. [58 U. S.] 540. The grant in that case was made in 1842, and was therefore subsequent also to the order of 1840, made on the petition of the bishop. If then we are right in supposing that Micheltorena's proclamation and the official note signed "Montesdioca," were mainly intended to give effect to the order of 1840, and the law of 1835, they afford no other or greater objections to this claim than would be presented by the law of 1835 and the order of 1840; and that these latter did not prevent the governor from granting the vacant lands of the missions has been, in effect, decided by the supreme court. But, if this question were still open, I should be of opinion that the right of the governor to grant the vacant lands of the missions ought to be affirmed. The laws of 1833 and 1834, and the provisional regulations, instructions, etc., made in pursuance, have clearly a two-fold object. The first is to secularize the missions and convert them into parochial curacies. The second is to take possession, for the

benefit of the nation, of all the property belonging to the missions—such as workshops, utensils, furniture, implements; as also the vineyards, orchards, cattle, etc.

The law of November 26th, 1833, in terms authorizes the departmental government "to use in the most convenient manner, the property devoted to pious uses in order to facilitate the operations of the commission" (for secularizing the missions). When, therefore, the government in view of the abuses and injustice consequent upon these laws and regulations, interposed by the law of 1835, the order of 1840 on the petition of the bishop, the proclamation of Micheltorena, and the Montesdioca document of 1845, it is most probable that it merely intended to suspend or annul that portion of the laws of 1833 and 1834 which related to the "property" of the missions; and not to interfere with the disposition of the vacant lands adjacent to them, to which the missions could pretend no title, either in law or in justice. The fact that Alvarado and Micheltorena continued to grant vacant lands belonging to the missions, without, so far as appears, objection from any quarter, strongly corroborates this view, and it was only when by its decree of May 28th, 1845, the departmental assembly proposed to sell or lease the entire property of the missions, that the order to suspend proceedings was issued. The claim of Bishop Alemany for the church lands, before the board, only embraced the churches, orchards, vineyards, cemeteries. curates' houses, etc. The vacant mission lands are not included, nor does any witness in that case enumerate those lands as constituting a part of the "property" of the missions, and this claim is in strict conformity with that which we have seen was alone insisted on by the bishop in his petition to the president in 1840. We have thus the practical construction given to these laws by both the government and the missionaries. Admitting that the governor's authority to grant, under the colonization laws, the vacant lands formerly included within the limits of the missionary establishments, it seems equally clear that under the law of 1835, the order of 1840 on the petition of the bishop, the proclamation of Micheltorena and the order of 1845 signed "Montesdioca," he was without authority to grant the orchards, vineyards, workshops, buildings, etc., which the labor of the fathers had created, and to the enjoyment of which, as urged by the bishop, they had a just and undeniable claim. Even if the decree of the assembly of May 28th, 1845, and that of March 30th, 1846, passed to give effect to it, could be regarded as conferring any authority on the governor not previously possessed by him, they did not authorize a sale such as that alleged in this case, for by the terms of both, the sales, if found necessary, were required to be made at public auction. But the grant produced refers for the authority of the governor to a decree of the assembly of the thirteenth of

April, 1846. I have not been able to discover what decree of the departmental assembly is here alluded to; none of that day has been produced, nor is any such found in the records of the proceedings of that body. It is urged, however, that the order contained in the Montesdioca document was revoked by the communication signed "Tornel," and addressed to the commandant general of the Californias, under date of March 10th, 1846. With reference to this document, it is to be observed that it appears to be a circular addressed to the commandant general, amongst other functionaries. All of it except the address is marked as a quotation, and its object seems to have been to stimulate the public authorities to a vigorous defense of the national territory, and the maintenance of the national honor. The only clause by which any authority can be deemed to be conferred on the governor, is that in which it is stated that the supreme government "expects from your loyalty and patriotism that you will dispose such measures as you may judge most suitable for the defense of the department, for which object ample power is granted to you and señor the governor." It is evident that the power here conferred was given to the commandant general as amply as to the governor. It can hardly be pretended that under it the commandant general could have sold the vineyards and orchards of the missions to whomsoever and at whatever price he chose. It appears to me that the object of this circular was merely to authorize and direct the general commanding to take the proper military measures for the defense of the country, and that had it been intended to revoke or modify the order signed "Montesdioca," prohibiting the sale of the mission property, and which was issued only three months previously, that object would have been unequivocally expressed, and the governor directed to make sales of that property to procure resources for the war. The board of commissioners were unanimously of opinion that this circular conferred no power to make the sale at bar, and in that opinion I concur.

From the foregoing it follows that, admitting the governor's right to grant the vacant lands of the missions, or even to sell them, as to which latter I express no opinion, it is nevertheless clear that he had no authority either to grant or sell the vineyards, orchards, cemeteries, mission buildings, etc., which, on the petition of the bishop, had been recognized by the president as belonging to the fathers—which had been restored to them by Michel-torena, and the sale of which under the assembly decree of May 28th, 1845, the supreme government had promptly interposed to prevent. If these views be correct, the claim must be rejected for want of authority in the governor to make the grant.